**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1742-19

K.F.,

     Plaintiff-Respondent,

v.

N.V.,

     Defendant-Appellant.

_____

Argued January 13, 2021 – Decided March 1, 2021

Before Judges Accurso, Vernoia, and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FD-16-1515-17.

Jessica Ragno Sprague argued the cause for appellant (Weinberger Divorce & Family Law Group, LLC, attorneys; Jessica Ragno Sprague, on the briefs).

Ellen Jo Gold argued the cause for respondent.

PER CURIAM

Plaintiff K.F. and defendant N.V. are the parents of a son, L.F.,[1] who is almost six years old. Defendant appeals from a December 17, 2019 order denying her application to relocate with L.F. to Pennsylvania. We reverse and remand for reconsideration of defendant's application.

I.

The parties began dating in April 2014 and L.F. was born in April 2015. During their courtship, the parties lived in Wayne, in a home owned by defendant's mother. After their relationship ended in June 2016, plaintiff moved three times. He eventually settled in Edison, about an hour's driving distance from Wayne, because Edison was a midway point between his job in Eatontown and defendant's residence.

In July 25, 2017, the parties entered into a consent order, confirming they would share joint legal custody of their son. Under the order, defendant was designated the parent of primary residence (PPR) and plaintiff was deemed the parent of alternate residence (PAR). Additionally, the order provided plaintiff would enjoy parenting time as follows:

> Thursday evening (pick up between [6:00-7:00] p.m. – Sunday at 7:00 p.m., except that [defendant] will have 1 full weekend per month from Friday after work

---

[1] We utilize initials of the individuals involved in this matter to protect the privacy of the parties and their child. R. 1:38-3(d)(3) and (13).

A-1742-19

– Sunday evening. The week prior to [defendant's] weekend, [plaintiff] would have Wednesday (pick up between [6:00-7:00] p.m.) until Friday after [defendant] gets out of work.

In June 2018, defendant told plaintiff she planned to marry R.M., and wished to move to Stewartstown, Pennsylvania, where R.M. lived. Stewartstown is approximately 155 miles from Edison. Plaintiff objected to the proposed move, arguing it would unduly reduce his parenting time.

On August 28, 2018, defendant filed an application seeking the court's permission to relocate to Pennsylvania with L.F. She also sought modification of the existing parenting schedule, clarification of the holiday and vacation provisions of the consent order, and a counsel fee award. Additionally, she requested an order compelling the parties to use a computer program called "Our Family Wizard" (Family Wizard),[2] to assist them in communicating about their son.

On August 29, 2018, plaintiff filed an order to show cause seeking to enjoin defendant from relocating with L.F. to Pennsylvania. He also filed a cross-application in November 2018, opposing defendant's relocation and requesting primary physical custody of L.F., as well as a counsel fee award. The

---

[2] This program also is referenced in the record as "My Family Wizard." It is a co-parenting program which allows parents to share messages, calendars and documents about their children.

trial court appointed a best interests evaluator and later permitted defendant to retain a rebuttal expert to address the proposed move.

## II.

The relocation hearing commenced in May 2019 and concluded the following October. During this period, defendant married R.M. Also, defendant's mother, K.V., sold the Wayne home where defendant lived for several years to the government, through a federal flood relief program. Thus, defendant relocated to temporary housing in Wayne, pending resolution of her relocation application.

Several lay witnesses and two experts testified during the relocation hearing. The trial judge found "all witnesses testified in a credible manner." When defendant testified at the hearing, she reaffirmed she wanted to live in Stewartstown because that is where her husband managed a family-owned garage and owned a photography business. Also, defendant asserted she wanted to move because she did not have a "support system" in New Jersey. She explained her parents lived in Pennsylvania, and members of her husband's family lived "about a mile from where [her husband] currently resides and would be able to help and assist [her] with anything" she needed.

Defendant further testified she worked five days a week, including most weekends, and was usually off Tuesdays and Wednesdays. She attested she and

L.F. would benefit from a move to Stewartstown because she could work "a couple of hours a day" from home for her husband and would be able to care for L.F. before and after school. She claimed this arrangement would not be feasible if she remained in New Jersey. Additionally, she contended her debts exceeded her assets, that she owed her parents close to $100,000 in legal fees, and she did not believe she could afford to continue living in New Jersey.

Consistent with her goal of relocating to Stewartstown, defendant offered different parenting plans which afforded plaintiff significant time with L.F. Under one plan, she suggested he enjoy parenting time on alternate weekends, including Sunday overnights when a Monday holiday fell after his weekend, equal time over the summer, and alternating holidays and school breaks. Alternatively, she proposed that when L.F. attended school, plaintiff could exercise parenting time on alternating weekends during the school year and assume the role of L.F.'s primary caretaker during the summer. Under this plan, she would exercise parenting time on alternate weekends. Defendant also offered to be responsible for at least half of the transportation needed to effectuate either parenting plan. Defendant calculated that under her parenting plans, once L.F. started kindergarten, plaintiff's overnight parenting time would decrease from 144 overnights to 114 overnights.

In support of her request that the parties utilize Family Wizard to communicate about their son, defendant extensively described the difficulties the parties faced during parenting time exchanges and through their texts and emails. She testified:

> If I wasn't agreeable to everything that [plaintiff] wanted, the conversation would go nowhere. He frequently would stand in front of car doors so that I couldn't get my son out of the car for . . . my parenting time exchanges. He frequently refused to bring [L.F.] out, and demand[ed] that I would stand there for hours and talk to him . . . and the communications would just constantly go in circles, and . . . never be productive.

Defendant also revealed that approximately a year after the parties' ended their courtship, plaintiff emailed defendant, stating, "[i]f you really end up wanting to move on without me . . . completely and starting a family, then please give up [L.F.] to me with sole custody . . . . I can't live without both of you." As the parties' relationship continued to deteriorate, plaintiff texted defendant and instructed, "You and [L.F.'s babysitter] need to get your fucking shit straight. You've been punishing me for a lot of dumb fucking shit and turning every positive thing into a negative . . . . Seriously, just get the hell out of our lives. You've pushed me over the edge." He also wrote, "[g]et out of our lives and go start a family where you're not trying to drive your child's father crazy. I am done."

Defendant testified plaintiff "would constantly corner me, . . . talk over me, he would yell, degrade me in conversations, he frequently used name-calling." By way of example, she confirmed plaintiff called her a "moron," a "bitch," "a horse's ass," and "asshole," and called her husband a "gun freak faggot." According to defendant, she repeatedly asked plaintiff to "stop harassing" her and not to text her while she was working unless there was an emergency involving their son. Plaintiff did not accommodate this request, so defendant suggested the parties utilize Family Wizard, hoping its use would diffuse their ongoing conflicts. Plaintiff refused to use this program.

L.F.'s babysitter testified she had watched L.F. twice a week since he was three months old. She stated she became responsible for certain parenting time exchanges and was uncomfortable when she handled those exchanges by herself because plaintiff yelled and cursed at her. Also, he upset her one day when he urinated in her presence while standing outside defendant's home, waiting to pick up L.F. Additionally, she testified she was with defendant's mother during a particular parenting time exchange when plaintiff confronted and shoved defendant's mother, causing L.F. to become upset and scream.

R.M. testified that he lived in Stewartstown, managed a family-owned garage, and owned a wedding photography business he purchased in 2018. R.M. stated the businesses were dependent on word of mouth in the Southern

Pennsylvania and Northern Maryland area, so he could not relocate to New Jersey. Further, he testified he earned approximately $60,000 a year managing the garage and earned a minimal amount from his nascent photography business.

Defendant's parents, K.V. and J.V. also testified at the hearing. Defendant's mother, K.V., affirmed she had lived in Pennsylvania for nearly thirty years, and had considered moving closer to Stewartstown to be more accessible to defendant and L.F. She confirmed that she and L.F.'s babysitter watched L.F. during the week while defendant worked. When describing parenting time exchanges with plaintiff, K.V. attested plaintiff was rude and condescending towards her, and would often yell at her in L.F.'s presence.

K.V. further testified she intended to sell her home in Wayne, where defendant and L.F. lived, because it was located in a flood area, it was "flooding for years," needed "a lot of repairs" and was "in bad, bad shape." Defendant's father, J.V., likewise testified the Wayne home needed to be sold, as it required substantial repairs. J.V. stated he and K.V. could not afford the upkeep of the property, that they only charged their daughter $1100 a month to rent the Wayne home, and the rental did not cover the shelter costs. Also, he noted the roof leaked, "pieces [were] coming off the house, and "it's been through a few floods so . . . it's . . . water damaged."

Regarding the parties' parenting time exchanges, J.V. testified plaintiff made his daughter uncomfortable, so he and his wife tried to assist defendant during these exchanges. J.V. explained that plaintiff "gets very agitated right out of the gate. His tone raises to a tone which does not foster any type of communication whatsoever . . . . [H]e makes it very confrontational." He noted plaintiff had called him and K.V. "fucking idiots, fucking morons" and that he heard plaintiff call defendant a "bitch." He also recalled an incident from Christmas Eve in 2017 when plaintiff said to K.V., "'Merry fucking Christmas,' and he was very, very agitated."

Plaintiff testified he enjoyed various activities with L.F., such as going to museums and fishing. Further, he confirmed that when L.F. was with him, L.F. often spent time with a cousin who was the same age as L.F. Plaintiff produced a calendar of days he enjoyed with L.F. in 2018. According to his calendar, plaintiff enjoyed 148 overnights, but was with L.F. for 202 days in 2018.

Plaintiff stated that if he were granted primary physical custody of L.F., he intended to move with his girlfriend to his parents' house in Bordentown, where L.F. would be closer to his mother's home, and defendant would "have the flexibility to visit more often." Plaintiff testified he never intended to have his son enrolled in school in Edison. He stated he had researched both the Bordentown and Stewartstown school systems, and found they had similar

ratings, but that "diversity" in Stewartstown was "almost nonexistent." Plaintiff testified he "reserved a spot" in a Bordentown preschool for L.F. but did not believe he informed defendant he reserved the spot. He explained, "I tried to talk to her about it, but she was unwilling to talk to me . . . on the topic." Nevertheless, he also testified on direct examination that currently, the parties communicated "[s]trictly [by] text, email, and if an emergency, a phone call. But we've never communicated over the phone even since [2017]."

On direct examination, plaintiff was asked if he thought the parties communicated well. He answered in the negative and advised he had offered to go to "a family mediator or even a family therapist." He conceded some of his communications were "inappropriate" but testified some of defendant's communications also were "inappropriate." Also on direct, plaintiff was asked if he "used language that someone might term abusive in some of [his] communications," and he responded, "I do a little bit of the, you know, talk like a sailor sometimes." Still, he stated he was opposed to using the Family Wizard program recommended by the experts. He explained:

> texts and email . . . it leads to miscommunication all the
> time. You can't tell tone. You don't know how
> someone said something. They might have mistyped,
> and . . . it's easy to miscommunicate, whereas, you
> know, a verbal conversation is how things have always
> been . . . in the past . . . . Her and I have been successful

> . . . verbally in the past.  I feel like it's attainable again
> and I think it sets a good example . . . for L.F.

Despite the parties' difficulties, plaintiff testified that if defendant did not move out of state, he was willing to accept the parties' current custodial arrangement.

Plaintiff's girlfriend testified she was pregnant with plaintiff's child and planned to move into his parents' home in Bordentown with him.  She said she and plaintiff spent considerable time with L.F. almost every weekend when plaintiff was scheduled to have parenting time, and that her sister-in-law babysat for L.F. once a week.  She confirmed plaintiff would be able to move to Bordentown even if he did not have custody of L.F., and that Bordentown is closer to where defendant wanted to reside in Pennsylvania.

## III.

In addition to the lay witnesses who testified, two mental health experts provided divergent opinions as to whether it was in L.F.'s best interest to move with defendant to Stewartstown.  Dr. Michelle LaCouture, defendant's rebuttal expert, testified in advance of the court-appointed expert, Dr. Catherine Golfnopoulos.[3]

---

[3]  The trial judge declined to admit the written report of either expert and confirmed in his oral decision that he instead relied on the testimony of the experts.

Dr. LaCouture holds a doctorate in marriage and family therapy. Following her evaluation, she concluded it would be in L.F.'s best interest to relocate to Stewartstown with his mother. Dr. LaCouture advised that she considered the fact that L.F. would soon begin attending school. She found this to be a significant factor because the parties currently lived approximately an hour from one another, and if L.F. attended school in Wayne while his father lived in Edison, it would not be feasible for plaintiff to drive L.F. to school every day and still arrive at his job in Eatontown on time. She testified she believed the maximum time a child should be in a car to commute to school was thirty minutes.

Dr. LaCouture also testified plaintiff told her he would be willing to move closer to defendant's residence if he became the primary residential parent. Dr. LaCouture found plaintiff's willingness to relocate only if he was the primary residential parent demonstrated he would use defendant's desire to relocate as leverage in the parties' custody dispute.

Dr. LaCouture further opined defendant's proposed relocation would be in L.F.'s best interest because defendant would not need childcare or a babysitter. Dr. LaCouture concluded defendant was seeking to relocate, not to interfere with plaintiff's parental rights, but to provide a better life for herself and L.F., both financially and in terms of quality time with L.F. The doctor was aware

defendant offered plaintiff extra parenting time in the summers to compensate for some parenting time he would miss due to the relocation. Although this expert conceded plaintiff's relationship with L.F. would be impacted by the relocation, she also believed the parenting schedule would change anyway as the child matured.

Dr. LaCouture also described the difficulties the parties had in relating to one another. She was particularly concerned about the level of animosity in the parties' text and email exchanges. She noted plaintiff often texted defendant during the workday, which bothered defendant, yet plaintiff did not appear to recognize defendant's discomfort. Additionally, she confirmed plaintiff was reluctant to use Family Wizard, and concluded, "[i]t's telling me that [plaintiff] would like the other party to conform to his way of communicating rather than recognizing that there is a breakdown and here's a usable tool to help that." Dr. LaCouture further explained that Family Wizard features a "tone meter" to regulate "charged language" and helps people to "learn to improve their communication. So, if we have one party . . . saying I don't know why my e-mails upset you so much, maybe we have a way of helping that person understand that, rather than the other person just continuing to say it." The doctor added that a person cannot "manipulate the [Family Wizard] log." When asked how her concerns about the parties' communication difficulties impacted

her best interests evaluation, Dr. LaCouture stated this factor weighed in favor of defendant.

Dr. LaCouture further testified she considered the stability of the home environment as between the parties. She observed that plaintiff moved after the parties' romantic relationship ended and reported he intended to move again but did

> not necessarily hav[e] a firm plan of where he will continue to live. For example, [plaintiff] offered that he may move with his girlfriend to her parents' house in East Brunswick. They were possibly saving for a home. If that was the case, . . . there are two more moves coming for him. There was just less of a stability with his movement than I felt there was for the mother in this case.

Regarding the quality and continuancy of L.F.'s education, Dr. LaCouture testified L.F.'s proposed school in Stewartstown was rated "at six over ten." By comparison, and apparently under the impression plaintiff wanted L.F. to attend school in Edison, Dr. LaCouture testified Edison's school system was rated "five out of ten." Still, Dr. LaCouture believed other factors weighed more heavily in the best interests evaluation. Asked to explain, Dr. LaCouture stated:

> [t]he fact that we have a mother who is reporting a need to move, that her remaining where she is, is not an option. We have a mother reporting that she feels uncomfortable with her direct communication with the other parent . . . . It sounds like [some earlier] proposals

A-1742-19

14

are more about leverage than what's best for the child. So those were more of a concern for me.

Dr. LaCouture further opined defendant was well prepared for the move, having researched the area and identified an appropriate school system, as well as an urgent care center and pediatrician for L.F.

When considering the parties' employment responsibilities, Dr. LaCouture recalled plaintiff initially told her he worked remotely on Fridays, but then clarified this happened "only one Friday a month, not every Friday." By comparison, Dr. LaCouture noted that if defendant lived in Stewartstown with her husband,

> she would not necessarily have to work because . . . she could work for him off hours, so she wouldn't necessarily have to work during the time [L.F.] would be in school. She wouldn't need childcare or [a] babysitter. So, there was a look at reduction in cost factor for both parties, but also that there is an available parent for [L.F.] rather than him going to a babysitter.

Asked if it would be in L.F.'s best interest to have a parent instead of a babysitter available, Dr. LaCouture answered, "[y]es."

Dr. LaCouture also opined on an appropriate interim parenting schedule for L.F. if he relocated with his mother. Initially, the doctor recommended L.F. attend preschool on a part-time basis so he would benefit from school activity and socialization yet continue to enjoy some weekday time with his father.

Asked if this parenting schedule could continue when L.F. entered kindergarten, plaintiff's attorney objected, arguing kindergarten was "a year and a half away." The judge responded, "if the relocation were granted, this would matter . . . . It would be within 12 months." He added, "we would be confronting this -- no matter which way it goes." Plaintiff's attorney replied, "Okay, so it's making a lot of presumptions, but go ahead." The judge replied, "[wh]oa. What's the presumptions? . . . . It's going to come right around the corner. So, you have to contend with this. Now, unless you want to go back to court a year from now."

Dr. LaCouture's testimony continued with a recommendation that L.F. attend kindergarten where his mother resided. She endorsed the idea that once L.F. was in kindergarten, plaintiff should shift to exercising parenting time on weekends, but qualified that this would depend on the proximity of his residence to that of defendant. Moreover, the doctor suggested that neither parent exercise a "right of first refusal" for parenting time, unless the additional time was to be exercised on an overnight basis. She explained that when parents are "not communicating effectively enough," seeking a right of first refusal "causes more conflict than it's worth and it can create just so much tension that gets trickled down to the child . . . . When you have people that are not communicating effectively enough, any last-minute change becomes full of conflict."

A-1742-19

16

Dr. Catherine Golfinopoulos subsequently testified as the court's expert. Dr. Golfinopoulos holds a doctorate in psychology. Prior to her testimony, she conducted in-person interviews of the parties and their son, and spoke with defendant's husband, as well as plaintiff's girlfriend, by phone. Dr. Golfinopoulos determined defendant's motivation for moving to Pennsylvania was her engagement. She did not believe defendant needed to move out of New Jersey for financial reasons or because defendant's mother opted to sell her home in Wayne. She stated, "I don't believe that your client cannot rent another apartment in the State of New Jersey . . . . In fact, I'm a landlord in Fort Lee, and I always rent a one bedroom for about [$1100 per month]."

Dr. Golfinopoulos further concluded it would not be in L.F.'s best interest to relocate with defendant to Stewartstown, which she testified was "[t]wo-and-a-half hours . . . driving distance" from where plaintiff lived. She determined L.F. needed constant contact with both parents, due to his age, and that both of his parents were equally fit to care for him. She opined that "at this stage in his life . . . he's still going through the bonding stages of life. He's continuing to bond with both parents, so therefore he needs to have both of them be part of his life." Plaintiff's attorney inquired whether the doctor would change her opinion if plaintiff moved to Bordentown, which would be closer to Stewartstown,

regardless of whether plaintiff or defendant had primary custody of the child. Dr. Golfinopoulos answered in the negative.

Dr. Golfinopoulos further testified that if defendant relocated to Pennsylvania, "then a consideration should be to shift the parenting and have the father be the primary parent." She was asked about this recommendation on cross-examination and explained she issued this recommendation "[b]ecause the mother is seeking to adjust the parenting plan." Defendant's counsel then inquired, "[b]ut you're aware that dad is also seeking to adjust the parenting plan, correct?" Dr. Golfinopoulos replied, "[h]e wasn't seeking to move and relocate." The exchange continued:

> Defendant's Counsel: You're aware that he, in fact, wrote on his intake forms to you that he was looking for primary custody. Is that correct?
>
> Dr. Golfinopoulos: Because the mother was seeking to relocate.

During cross-examination, Dr. Golfinopoulos was shown examples of some of plaintiff's toxic text messages and was asked if it would have been appropriate for plaintiff to stop texting defendant when she said, "[s]top harassing me." Dr. Golfinopoulos replied, "she should have stopped and not said anything either, and then it would have ended it. Don't respond. If I don't want to communicate with somebody, I stop responding. Stop responding to

each other." The doctor added, "[t]here's nothing here that involves the child. So, how could anybody accuse anyone of not . . . coparenting? They are arguing. Somebody should have stopped."

IV.

On December 17, 2019, the judge rendered his opinion from the bench, and issued an accompanying order, denying defendant's request to relocate to Pennsylvania. The order contained a "self-executing" provision that if defendant relocated to Pennsylvania, plaintiff would become L.F.'s primary physical custodian. Neither the judge's oral opinion nor his accompanying order addressed defendant's request to clarify holiday and vacation time under the July 25, 2017 consent order. Also, the judge neglected to rule on defendant's request that the parties be compelled to use Family Wizard, notwithstanding the fact both experts recommended use of this program.

In addressing L.F.'s best interest in the context of the relocation issue, the trial court initially expressed that its decision did not limit defendant's right to live wherever she chose. Nonetheless, the judge found defendant's proposed relocation would "have an adverse effect on the plaintiff's parenting time as the non-custodial parent by significantly altering the frequency and convenience of

plaintiff's parenting time."  In support of this conclusion, the judge considered the statutory factors identified in N.J.S.A. 9:2-4(c), namely:

> the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.
>
> [Ibid.]

Referring to the July 25, 2017 consent order and N.J.S.A. 9:2-4(c), the judge observed:

> it was quite clear from all the testimony and evidence presented [that] the parties do not communicate well at all.  The plaintiff, at times of high tension, has used harsh and demeaning language against the defendant.
>
> And, while the defendant tends to avoid retaliating with similar language, defendant tends to completely shut down and not communicate at all, even when plaintiff is seeking answers to basic or important questions.

> Defendant has insisted that the parties only communicate through email. This is a clear sign that defendant wants to limit communication with the plaintiff. In fact, plaintiff presented much evidence showing that he was trying to communicate, negotiate, compromise, and share information . . . with the defendant with no response forthcoming from the defendant in numerous instances.

Based on these findings, the judge found the statutory factor involving the parties' ability to cooperate and communicate favored the parties equally.

Regarding the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse, the judge concluded that because defendant initially limited plaintiff's parenting time, this factor was in his favor. The judge also determined the next factor, the interaction and relationship of the child with his parents and any siblings would be in equipoise because both parents had a good relationship with their son, but because plaintiff's girlfriend was pregnant and L.F. would have a sibling, this factor militated in favor of plaintiff.

Additionally, the judge found the factor regarding domestic violence was of no significance because there was no evidence either parent posed a threat to L.F. Further, because L.F. was only four years old when the hearing concluded, the judge determined L.F. was unable to express a parental preference.

Turning to L.F.'s needs, the judge stated:

The court finds this factor to be greatly significant in its decision to deny defendant's relocation application. As testified to by Dr. Golfinopoulos, it is important for [L.F.] to have constant contact with both parents and maintain a relationship.

Furthermore, the quality and duration of that contact allows for L.F. to bond with the respective parent. If [L.F.] were relocated, his bonding time with the plaintiff would change . . . as each expert testified to, from the parenting time that plaintiff had been experiencing.

The court notes that, based on the testimony, <u>[L.F.] spent approximately 202 days with the plaintiff spread through the past year. There is no question that [L.F.] would not be able to see plaintiff that many days if defendant moved [L.F.] approximately three hours away from the plaintiff.</u>

I'll quote from the plaintiff's summation. "The total lack of understanding that the defendant demonstrates as to the need for her son to have a good healthy relationship with his father weighs very heavily against her in this analysis. Dr. Golfinopoulos opined how, at this tender age, it was so important to have both parents in close proximity."

Now, while the court recognizes that [L.F.] needs to maintain the same bonding time with the defendant, it will be defendant's choice as to how she can best accomplish this should she choose to leave New Jersey. This factor is in the plaintiff's favor.

[Emphasis added.]

A-1742-19

22

The judge also determined both parents could provide a stable home environment. He observed defendant lived "at a few different addresses" after the parties separated, that defendant "had a stable home while living in . . . Wayne," but after that home was sold, she had a "temporary unstable living arrangement" and planned on living in her husband's home. Because there was no testimony about the home defendant hoped to share with her husband, the judge found this factor leaned in plaintiff's favor.

Regarding the quality and continuity of L.F.'s education, as well as the fitness of the parties, the judge found these factors did not lean in either party's favor since he determined the school systems in Bordentown and Stewartstown were "comparable" and neither party was unfit.

Referencing the geographical proximity factor, the judge stated:

> Obviously[,] this . . . factor is at the heart of the case.
>
> If defendant were to relocate [L.F.] to Stewartstown, . . . she would greatly alter the geographic proximity to plaintiff's home. [S]tewartstown is approximately 158 miles from plaintiff's current home. This is more than four times further away than the current distance between the parties' homes.
>
> As previously stated, the court finds that . . . creating such a distance between [L.F.] and the plaintiff would clearly negatively impact the frequency and quality of the bonding time . . . for [L.F.] and his father.

> While the court acknowledges that the defendant has testified to and argued that the current parenting time plan will need to be altered once [L.F.] begins school, the court finds this position to be speculative.
>
> As the plaintiff has testified, he was willing to move closer to . . . the defendant once [L.F.] began going to school. This was obviously under the assumption that the defendant would remain living in New Jersey and in close geographic proximity to Wayne . . . . This factor is in plaintiff's favor.
>
> [Emphasis added.]

When assessing the extent and quality of time L.F. spent with his parents prior to and subsequent to the parties' separation, the judge acknowledged defendant had "continuous, extensive and quality time with [L.F.] since he was born." However, he observed:

> plaintiff has enjoyed similar frequent quality parenting time with [L.F.] since the parties entered into the consent agreement on July 25, 2017, more than two years ago, or approximately half of [L.F.'s] life.
>
> As previously noted, plaintiff spent 202 days, a combination of overnights and day visits, with [L.F.] last year. The court finds that plaintiff, as the current non-custodial parent, is a very involved and engaged parent who seeks to spend as much time with his son as is afforded him. Again, this factor is equal as to both parties.
>
> [Emphasis added.]

24

As to the statutory factor regarding the parties' employment responsibilities, the judge found plaintiff could not maintain his current job if he had to move to Pennsylvania because of the distance. Further, he concluded that defendant's intention to resign from her job and work part-time for her husband, although permitting her to be home more frequently, called into question her ability to provide sufficient financial support for L.F. Thus, the judge found "the bonding time lost for plaintiff would outweigh any benefit that [L.F.] may receive from the defendant being home with [L.F.] after school . . . . Due to the uncertainty regarding defendant's employment and compensation, this factor is in plaintiff's favor." Moreover, the judge concluded the fact R.M. "decided to buy a house and establish a livelihood in Stewartstown does not mean he is incapable or precluded from changing his decision and reestablish[ing] himself in another community."

In denying defendant's request to relocate, the judge considered the overall impact of the proposed move on L.F. and stated:

> the court does not believe traveling in an automobile 5 and a half to 6 hours every other weekend for the next 14 years until [he] turns 18 is, in fact, in his best interest, if that can be avoided.
>
> So, today we're going to make this a self-executing order. [L.F.] will remain or can remain in the defendant's custody if the defendant remains living in

> New Jersey. However . . . plaintiff will gain custody
> . . . if defendant . . . relocate[s] to Pennsylvania.

Regarding each party's request for counsel fees, the judge denied same, simply stating "neither party filed their respective application in bad faith."

V.

On appeal, defendant argues the December 17, 2019 order: (1) is not based on substantial, adequate or credible evidence; (2) impedes her constitutional right to travel and her marital rights; (3) fails to acknowledge there was cause for her relocation; (4) reflects a misapplication and flawed analysis of N.J.S.A. 9:2-4, and fails "to extend the holdings in A.J. v. R.J.[4] to this matter; (5) improperly relies on the testimony of Dr. Golfinopoulos, which should have been excluded as a "net opinion"; (6) fails to resolve all outstanding issues; and (7) mistakenly deprives her of a counsel fee award.

For the first time on appeal, defendant also argues the trial court acted improperly throughout the course of the proceedings. Because no such argument was raised during the relocation hearing, and since we conclude the December 17, 2019 order must be reversed and remanded to a different judge, we decline to address this novel argument. We also find defendant's constitutional and net

---

[4] 461 N.J. Super. 173 (App. Div. 2019).

opinion arguments to be without sufficient merit to warrant comment in this opinion, Rule 2:11-3(e)(1)(E), and that her reliance on the intra-state relocation case of A.J. v. R.J. is misplaced.

Our review of a family court order is limited. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). Generally, the family court's factual findings "are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "Discretionary determinations, supported by the record, are examined to discern whether an abuse of reasoned discretion has occurred." Ricci v. Ricci, 448 N.J. Super. 546, 564 (App. Div. 2017) (citing Gac v. Gac, 186 N.J. 535, 547 (2006)). An abuse of discretion occurs when a trial court's decision "rested on an impermissible basis, considered irrelevant or inappropriate factors, failed to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence." Elrom v. Elrom, 439 N.J. Super. 424, 434 (App. Div. 2015) (internal quotation marks and citations omitted). Challenges to legal conclusions, as well as the trial court's interpretation of the law, are subject to de novo review. Ricci, 448 N.J. Super. at 565 (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

Under N.J.S.A. 9:2-2, a parent who seeks to remove a child from this state when the other parent does not consent must demonstrate "cause" for the

removal. The legislative intent of N.J.S.A. 9:2-2 was "to preserve the rights of the noncustodial parent and the child to maintain and develop their familial relationship." Bisbing v. Bisbing, 230 N.J. 309, 323 (2017) (quoting Holder v. Polanski, 111 N.J. 344, 350 (1988)).

In Bisbing, the Court interpreted "cause" under N.J.S.A. 9:2-2 as requiring the petitioning parent to satisfy the "best interests analysis . . . set forth in N.J.S.A. 9:2-4(c), supplemented by other factors as appropriate." 230 N.J. at 338 (citing N.J.S.A. 9:2-4(c)). The Bisbing Court specifically overruled the two-part removal test in Baures v. Lewis, 167 N.J. 91 (2001), and replaced it with the best-interest standard embodied in N.J.S.A. 9:2-4. 230 N.J. at 312-13. Further, the Bisbing Court instructed that in making "the sensitive determination of cause[, a court] must weigh the custodial parent's interest in freedom of movement as qualified by his or her custodial obligation, the State's interest in protecting the best interests of the child, and the competing interests of the noncustodial parent." Id. at 323 (internal quotation marks omitted) (quoting Holder, 111 N.J. at 350).

Here, it is readily apparent the trial judge considered the principles enunciated in Bisbing and was cognizant of his charge to review the statutory factors under N.J.S.A. 9:2-4(c) when assessing the parties' cross applications. However, the judge's analysis was impermissibly tainted by the significant

weight he gave to plaintiff's claim he spent "202 days" with L.F. in 2018. Indeed, we are persuaded the judge's reference to the amount of days plaintiff spent with his son in 2018 skewed his best interests analysis, in that he mistakenly, albeit unintentionally, elevated plaintiff's custodial status to that of a primary residential parent. This error deprived defendant of a fair consideration of L.F.'s best interests in the context of her relocation application. Compounding this error was the judge's failure to explain why, given the stark differences in the opinions of the court-appointed and rebuttal experts as to whether it was in L.F.'s best interest to relocate to Pennsylvania, he rejected Dr. LaCouture's testimony over that of Dr. Golfinopoulos. Moreover, the judge provided no findings about defendant's proposed parenting plans before he rejected them. Further, he issued a "self-executing" order for a transfer in custody if defendant relocated to Pennsylvania, regardless of the timing of any such relocation, and without providing for a hearing on the merits of a change in custody in that event. Accordingly, the December 17, 2019 order cannot stand.

In cases involving custody and parenting time, it is axiomatic that the best interests of the child is the fundamental legal principle guiding our review. D.A. v. R.C., 438 N.J. Super. 431, 450 (App. Div. 2014) (citing Kinsella v. Kinsella, 150 N.J. 276, 317-18 (1997)). Here, the trial judge's analysis strayed from a

proper evaluation of L.F.'s best interests by ignoring the import of the July 25, 2017 consent order and focusing on the number of days plaintiff spent with his son in 2018.  As a threshold matter, under the July 25, 2017 order, defendant was designated as the PPR and plaintiff was designated as the PAR.  Pursuant to Appendix IX-A to Rule 5:6A, the PPR and PAR are defined as follows:

> (1) Parent of Primary Residence (PPR) - The parent with whom the child spends most of his or her overnight time.  The primary residence is the home where the child resides for more than 50% of the overnights annually. If the time spent with each parent is equal (50% of overnights each), the PPR is the parent with whom the child resides while attending school. Overnight means the majority of a 24-hour day (i.e., more than 12 hours).
>
> (2) Parent of Alternate Residence (PAR) - This is the parent with whom the child resides when not living in the primary residence.
>
> [Pressler & Verniero, Appendix IX-A to Rule 5:6A at 2052. (Emphasis added; alteration in original).]

The parties did not dispute that under the terms of the July 25, 2017 consent order, defendant was awarded PPR status by virtue of the number of overnights she enjoyed with L.F.  Yet, the trial judge rejected defendant's relocation request, and by extension, her proposed parenting plans for the move, without assessing her parenting plans on the basis of overnights plaintiff would lose.  Instead, the judge twice referred to the fact plaintiff spent "202 days" with

L.F. in 2018 and found "[t]here is no question that [L.F.] would not be able to see plaintiff that many days if defendant moved [L.F.] approximately three hours away from the plaintiff."  Accordingly, a fair reading of the judge's decision demonstrates he denied the relocation application, in large measure, because of his concern plaintiff would lose too many "days" if defendant relocated with L.F. to Stewartstown.  Further, after adopting this approach, the judge did not compare the number of days L.F. spent with his father, versus his mother, and how the allocation would be impacted under the defendant's proposed parentings plans if she were permitted to relocate.

It also is worth noting that defendant and Dr. Golfinopoulos testified differently about how long the drive would take from Stewartstown to Bordentown (ranging from "a little over two hours" to two-and-a half hours), and that plaintiff, notwithstanding his testimony about moving to Bordentown with his girlfriend, testified the drive from his home in Edison to Stewartstown ranged "from two hours and 30 minutes to three hours and 10 minutes."  Despite this varying testimony, the judge found "all witnesses testified in a credible manner," but he denied defendant's relocation request, in part, because he believed it would not be in L.F.'s best interest to be "traveling in an automobile 5 and a half to 6 hours every other weekend for the next 14 years."

We are convinced that defendant is entitled to reconsideration of her relocation application based on the number of overnights each parent would enjoy under her proposed parenting plans. Further, the estimated length of the drive between where each party lives should be readily verifiable, but in the face of disparate testimony on this point, the remand judge should explain which party's estimate is more credible.

We also are satisfied the judge's "self-executing order" was improvidently entered. It contained no end date and was not premised upon an assessment of the parties' and the child's circumstances at the time such a move might occur. As we have noted, "[a]bsent exigent circumstances, changes in custody should not be ordered without a full plenary hearing." Faucett v. Vasquez, 411 N.J. Super. 108, 119 (App. Div. 2009) (citing R. 5:8-6; Entress v. Entress, 376 N.J. Super. 125, 133 (App. Div. 2005)). See also R.K. v. F.K., 437 N.J. Super. 58, 62 (App. Div. 2014) and R. 5:8-6.

Because the judge who heard this matter engaged in weighing evidence and opined on the credibility of the parties and other witnesses, we are convinced the remand hearing should be conducted by another judge. See N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 617 (1986). Further, now that approximately two years have passed since the parties were evaluated, and L.F. presumably has commenced full time schooling, the remand court must consider

the parties' current circumstances in the context of its best interests analysis. We also encourage the remand judge to promptly conduct a case management conference and if appropriate, appoint an expert, per <u>Rule</u> 5:3-3, to newly address whether it is in L.F.'s best interest to relocate with defendant to Pennsylvania. The remand court is not bound to reappoint the expert appointed by the first judge and may, of course, exercise its own judgment in making any appointment. We mention this because Dr. Golfinopoulos opined on defendant's credibility regarding defendant's inability to continue to live in New Jersey. In doing so, this expert referenced her own experience as a landlord, without any review of defendant's finances. Further, the parties are not prohibited from retaining individual experts to opine on L.F.'s best interests, if they wish. <u>R.</u> 5:3-3(h).

VI.

We need not extensively address defendant's counsel fee argument. In short, <u>Rules</u> 5:3-5 and 4:42-9 direct the trial court to consider a number of factors when assessing a counsel fee request. Here, the judge solely considered the parties' lack of bad faith. Thus, we reverse the denial of defendant's counsel fee application, and remand for a review of her fee request upon the conclusion of the next relocation hearing. In doing so, we are mindful plaintiff did not cross-appeal from the denial of his counsel fee application.

Finally, to the extent defendant's motion to clarify the parties' holiday and vacation schedules, and her application to have the parties communicate through the Family Wizard program remain unresolved, these issues should be immediately addressed. It is evident the parties' co-parenting relationship is plagued by conflict, and it is not in L.F.'s best interest to have these issues linger.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION